**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

DARIS STEEN, WILLIAM JUDSON, SR. and :    Civil Action No.: 22-cv-4571
RICHARD STEIN, as Class Representatives, on :
behalf of themselves and all others similarly :
situated, :
:
                           Plaintiffs, :    **CLASS ACTION COMPLAINT**
:
              v. :
:
ASSURANT, INC., BRANDON BROWN, ASH :    **Jury Trial Demanded**
BAUER, and JOSEPH AMENDOLA, in their :
individual and professional capacities, :
:
                       Defendants. :
-------------------------------------------------------------X

       Plaintiffs Daris Steen, William Judson, Sr. and Richard Stein ("Plaintiffs"), on behalf of themselves and all others similarly situated, hereby allege through their counsel, Wigdor LLP, as against Defendants Assurant, Inc. ("Assurant" or the "Company"), Brandon Brown, Ash Bauer and Joseph Amendola, in their individual and professional capacities (collectively, "Defendants"), as follows:

<u>**PRELIMINARY STATEMENT**</u>

       1.      For *years*, Plaintiffs along with other Black employees at this publicly traded insurance company (NYSE: AIZ) have been subjected to devastating ongoing racial discrimination.

       2.      When Plaintiffs dared to report the horrific racial discrimination to Assurant, the Company opted to ignore the complaints completely or otherwise engage in blatant retaliation. At the same time, Assurant repeatedly promoted and rewarded the white individuals responsible for carrying out the racial discrimination.

3.      Assurant is a global seller of various finance and insurance ("F&I") products, including insurance products related to the automobile industry, a division internally referred to as "Assurant Dealer Services" or "ADS."  Plaintiffs and the Proposed Class Members work within this automobile insurance group.  According to recently filed documents with the U.S. Securities and Exchange Commission ("SEC"), while other divisions have suffered financial setbacks, the automobile insurance business has been a strong performer for Assurant.

4.      Auto insurance sales is a crowded, buyer's market.  While corporate-level strategies can make some difference, ultimately the success of a company like Assurant rises and falls with its local managers and salespeople, employees like Plaintiffs and Proposed Class Members.

5.      Rather than rewarding them for their significant contributions to Assurant's bottom-line, Assurant executives, all white males, treat them like second-class citizens.

6.      For years, a white male manager, Tom Bond, based in Atlanta, repeatedly engaged in biased statements to employees, including to Mr. Steen and Mr. Judson.  By way of example only, Mr. Bond made remarks such as he did "not understand" why people "complained about slavery."  In reference to our country's history of slavery, Mr. Bond said:

> The [African] slaves **_should have been happy_** that they were no longer in Africa.
>
> Slavery was **_not all that bad for slaves_** because they had food and shelter from slave owners.

7.      On top of this rhetoric, Mr. Bond openly griped about a shortage of "ammunition" in the U.S., which was a problem for him, as a member of the "white majority."  In fact, Mr. Bond liked to talk about the rights of "white citizens to bear arms" in the U.S. and reminded Assurant employees that white people in the U.S. were still the "majority."

8.     Against this backdrop, during Covid-19 and the transition to Zoom meetings, Mr. Bond shockingly displayed three semi-automatic firearms on his desk during a Zoom. Defendant Brown led this Zoom with at least 15 employees on the call, including Mr. Steen and Mr. Judson.

9.     During this video call, another white manager Eric Feussner asked Mr. Bond about the three guns. Mr. Bond proudly picked up one of his firearms to it show off and appallingly, pointed it into his camera at the employees. Mr. Steen and Mr. Judson were horrified. While they were speechless in shock, and Mr. Brown said nothing to halt the conversation, Mr. Feussner felt emboldened to volunteer that he also owns semi-automatic weapons, and thereafter the discussion about these firearms continued.

10.     Given Mr. Bond's running commentary about white people being the "majority," and remarks that "slaves" did not have it "that bad," waving semi-automatic guns around during a Zoom meeting, as well as pointing a gun directly into the camera, was highly disturbing and upsetting to Mr. Steen and Mr. Judson, who were two of the four Black employees on the video call.

11.     After years of experiencing second-class citizen status at Assurant, it was not lost on both Plaintiffs that had either one of them dared display a gun during a Zoom, much less point a semi-automatic weapon into the camera at the other employees, they would have been labeled "gangsters" and fired on the spot.

12.     Mr. Steen previously had been too afraid to speak up to Mr. Brown, but he could not stay silent about this incident. Disgustingly, yet predictably, after Mr. Steen complained to Mr. Brown and said it needed to be reported to Human Resources ("HR"), it was Mr. Brown who became upset at Mr. Steen. Mr. Brown defended Mr. Bond's conduct, and refused to report the event to HR. When Mr. Brown continued to refuse to do anything, Mr. Steen emailed HR about

the Zoom.  Outrageously, HR had a single call with Mr. Steen about the incident and then, several weeks later, HR called to tell him that the matter was resolved.).  Once Mr. Brown found out about the email to HR, *Mr. Brown refused to speak to Mr. Steen*.

13.     Mr. Brown, a 45-year-old senior executive at Assurant and Mr. Steen's manager – intentionally refused to talk to Mr. Steen or answer his telephone calls for *eight months* after this incident – behavior commonly referred to by teenagers as the "silent treatment."  When Mr. Steen contacted HR to complain that his manager was refusing to speak to him, which of course impeded his ability to work, HR told Mr. Steen to text or email Mr. Brown.

14.     Recently, Assurant promoted Mr. Brown.

15.     It is rare to see a public company flout its noncompliance with the law as brazenly as Assurant has done and continues to do.  Such abhorrent conduct perpetuates only when the directives come from the very top of the organization.

16.     In addition to a work environment permeated with such horrific racial bias, Assurant's white executives knowingly and systemically paid Plaintiffs and the Proposed Class Members substantially less than their white peers.  Assurant, using a decades-old "commission formula" that a mathematics professor could not understand, proceeded to award white employees higher base salaries, higher commissions and bonuses, as compared to Plaintiffs and the Proposed Class.  Assurant knowingly discriminated against Plaintiffs and the Proposed Class in the terms and conditions of their employment by assigning the more lucrative geographic sales districts to white employees, while sending Black employees to the "other side of the tracks," to try to make money from the lowest performing and most problematic auto dealerships.

17.     Mr. Steen, Mr. Judson and Mr. Stein, with their numerous degrees, credentials and sales performance statistics that far exceed those of similarly situated white peers, have had to

stand by and watch less credentialed, less experienced and lower performing employees receive greater pay and be promoted year after year for no reason other than their white skin.

18.    This is the ultimate illustration of racism – when the assumption is made that an individual is not as smart as or as deserving as another person because of the color of his or her skin.

19.    This is exactly what Assurant has done and continues to do.  It has been on notice of these discriminatory practices for years but has done nothing.

20.    Incredulously, in an effort to promote the Company, Assurant advertises to the public, its shareholders and potential investors that:

- Our core values – Common Sense, Common Decency, Uncommon Thinking, Uncommon Results – guide our every action at Assurant. These values inspire our commitment to be a responsible corporate citizen.

- Common Decency: We act with integrity. We treat others with respect, courtesy, and kindness. We're honest, transparent and committed to doing the right thing.

- Responsible Employer: We are a responsible employer with a culture that values diversity, equity and inclusion, while recognizing the importance of investing in employee talent.

21.    There is nothing "decent," "honest" or "respectful" about treating Black employees as "less than" their white peers for no reason except the color of their skin.  It also is unlawful.

22.    Assurant can no longer escape accountability for its wrongful conduct.  Plaintiffs bravely bring this action to shed light on the company-wide discrimination and to secure their rights and the rights of other Black employees to workplace fairness, respect and equality.

## ADMINISTRATIVE PROCEDURES

23.    Plaintiffs have filed Charges of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), an administrative pre-requisite to filing an action under Title

VII of the Civil Rights Act of 1964 ("Title VII").  Mr. Judson has received his right to sue notice and this action is commenced within the applicable deadlines.  Subsequent to receipt of their right to sue notices, Mr. Steen and Mr. Stein will amend to include claims under Title VII.

24.     Pursuant to the New York City Human Rights Law ("NYCHRL") § 8-502, Plaintiffs will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within 10 days of its filing, thereby satisfying the notice requirements of this action.

25.     Plaintiffs have complied with any and all other prerequisites to filing this action.

## JURISDICTION AND VENUE

26.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions, including the deprivation of Plaintiffs' rights under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").  The Court has supplemental jurisdiction over Plaintiffs' related state and local law claims pursuant to 28 U.S.C. § 1367(a).

27.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant Assurant's headquarters are located in Manhattan, and a substantial part of the events or omissions giving rise to this action, including decisions about certain of the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

28.     Plaintiff Daris Steen currently is a District Manager ("DM"), and formerly an Area Manager ("AM"), at Defendant Assurant, Inc.  Plaintiff Steen is a resident of Florida and a citizen of the United States.  At all relevant times, Plaintiff Steen met the definition of an "employee" under all applicable statutes.

29.     Plaintiff William Judson, Sr. is a former DM at Defendant Assurant, Inc.  Plaintiff Judson is a resident of Georgia and a citizen of the United States.  At all relevant times, Plaintiff Judson met the definition of an "employee" under all applicable statutes.

30.     Plaintiff Richard Stein is a DM at Defendant Assurant, Inc.  Plaintiff Stein is a resident of Florida and a citizen of the United States.  At all relevant times, Plaintiff Stein met the definition of an "employee" under all applicable statutes.

31.     Defendant Assurant, Inc. ("Assurant" or the "Company") is a Delaware-registered corporation with operations throughout the U.S., including in New York, New York.  Defendant Assurant's principal place of business is located at One Chase Manhattan Plaza, New York, New York 10005.  It is traded publicly on the New York Stock Exchange ("NYSE") under the symbol "AIZ." At all relevant times, Defendant Assurant has met the definition of an "employer" of Plaintiffs under all applicable statutes.

32.     Defendant Brandon Brown is a Regional Development Manager at Defendant Assurant.  Defendant Brown is a resident of North Carolina and is a citizen of the United States. At all relevant times, Defendant Brown has met the definition of an "employer" of Plaintiffs under all applicable statutes.

33.     Defendant Ash Bauer is an Executive Vice President at Defendant Assurant.  Upon information and belief, Defendant Bauer is a resident of Illinois and is a citizen of the United States.  At all relevant times, Defendant Bauer has met the definition of an "employer" of Plaintiffs under all applicable statutes.

34.     Defendant Joseph Amendola is a Senior Vice President, Sales and Marketing at Defendant Assurant.  Upon information and belief, Defendant Amendola is a resident of Illinois

and is a citizen of the United States.  At all relevant times, Defendant Amendola has met the definition of an "employer" of Plaintiffs under all applicable statutes.

## FACTUAL ALLEGATIONS

### I.    ASSURANT'S INSURANCE PRODUCTS

35.    Assurant (NYSE: AIZ) is a global seller of various finance and insurance ("F&I") products, with its main operation in the United States, and its global headquarters in New York City.  It has $10 billion in annual sales revenue and employs 16,000 people globally.

36.    Assurant's products include mobile-device insurance, extended service contracts, renters' insurance, lender-placed insurance products, and insurance policies for appliances and tools.

37.    Assurant also sells insurance products related to the automobile industry, a division internally referred to as "Assurant Dealer Services" or "ADS."  Plaintiffs and the Proposed Class Members work within this automobile insurance group.

38.    As part of its automobile insurance business, Assurant, through its sales employees, including Plaintiffs herein, partners with automobile dealerships to determine the F&I products that will best fit a dealership's customer base and sales.  These F&I products include vehicle service contracts, extended dealer-obligor contracts and vehicle theft protection.  The Assurant sales employee will then set up a program for the dealership to sell Assurant products, integrating marketing, actuarial and other support services, with the dealership reselling the products to individual car purchasers and pre-existing customers of the dealership.

39.    Thus, Assurant's sales employees must possess a great deal of knowledge about the complex insurance products they sell; creativity to shape that knowledge into product offerings

that will benefit a given dealership; and the patience and personability to maintain the loyalty of their dealership- client accounts.

40.    Moreover, because Assurant also manages the cash generated by some insurance products, its sales employees must be able to understand and pitch investment strategies to the dealerships they work with.

41.    Auto insurance sales is, to say the least, a crowded, buyer's market.  While corporate-level strategies can make some difference, ultimately the success of a company like Assurant rises and falls with the abilities and performance of its local managers and salespeople. That success has been key to Assurant's bottom-line in recent years.  While its other products have struggled, according to its February 2022 Annual Report filed with the SEC, its automotive branch has continued to grow.

## II.    ASSURANT'S FALSE PROMISES TO THE PUBLIC AND ITS EMPLOYEES

42.    Assurant messages to the public, its shareholders and employees that it has a "global commitment" to be a socially responsible company.  Assurant claims that it has a "Social Responsibility Strategic Framework" that centers on four core pillars: Responsible Employer, Impact on Society, Customer Commitment, and Integrity and Ethics.  Assurant says that it operates by "developing top talent and fostering a diverse, equitable and inclusive culture," that drives a litany of allegedly positive results from its actions.

43.    Assurant further represents that:

- Our values guide the way we support our customers and work with one another. Our core values – Common Sense, Common Decency, Uncommon Thinking, Uncommon Results – guide our every action at Assurant. These values inspire our commitment to be a responsible corporate citizen.

- Uncommon Thinking: We're never satisfied with the status quo. We seek diverse perspectives and thrive on challenge. We believe there's always a way to build upon our successes.

- Common Decency: We act with integrity. We treat others with respect, courtesy, and kindness. We're honest, transparent and committed to doing the right thing.

- Responsible Employer: We are a responsible employer with a culture that values diversity, equity and inclusion, while recognizing the importance of investing in employee talent.

- Integrity & Ethics: We adhere to unwavering standards of integrity, ethics, governance, privacy and information security.

44.    Not satisfied with these representations, Assurant markets to the public that it is the proud recipient of a "Great Place to Work®" which it says is a:

- Prestigious award based entirely on current employees' experience working at Assurant'

- This year, 82% of employees said it's a great place to work – 23 points higher than the average U.S. company; and

- Assurant ranked among the leading U.S. companies for its overall commitment towards equity and inclusion.

45.    Too many other promises regarding its "commitment" to culture, diversity, values and common decency exist on its website to repeat herein.

46.    It is confounding that the Company can advertise such promises to the public, its shareholders and future investors about its values and "four pillars" given the appalling treatment of Plaintiffs and similarly situated employees.

47.    Although substantial mistreatment occurred under the watch of TWG, Assurant assumed responsibility for this conduct when it folded Mr. Brown, Mr. Bauer, Joseph Amendola

and a handful of other executives into its corporate home and has ratified their conduct since 2018 through the present.

### III.   <u>WHITE MALE CENTRIC LEADERSHIP: "INEXORABLE ZERO" INFERENCE</u>

48.   At Assurant, within its Dealer Services division, employees are subjected to a corporate culture that operates based on an all-white executive team.  Since 2007 when Mr. Steen started work at TWG and reported to Mr. Brown, the group has been led <u>exclusively by white men</u>.

49.   In over 50 years, not a single person of color has been in a position higher than Mr. Steen when he was an Area Manager ("AM") in this division.  Therefore, at the senior leadership level, 100% of decision-making authority is in the hands of white men.  The ratio of white leaders to Black leaders is 100:0.



Martin Jenns |
Executive Vice
President &
President of Global
Automotive



Ash Bauer |
Executive Vice
President



Jeffrey Strickland |
Senior Vice
President, Dealer
Services & Strategic
Accounts



Joe Amendola |
Senior Vice
President, Sales &
Marketing



Wayne Moore |
Divisional Vice
President, Sales



Sean Barnes |
Regional Vice
President



Tim Bonko | Region
Vice President



Brandon Brown |
Regional
Development
Manager



Chris Renner |
Regional Sales
Manager



Thomas Bond |Area
Manager

50.     Such a complete absence of Black individuals from senior management effectively proves discrimination on its face without the need for statistical or other evidence.  In *International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 342 n.23 (1977), a case addressing gender discrimination, the Supreme Court explained that there was no way to explain away a complete lack of women in leadership:

"[T]he company's inability to rebut the inference of discrimination came not from a misuse of statistics but from the 'inexorable zero.'"

51.     Similarly, Assurant cannot explain away the disparity that is inherent in its senior leadership.  The ADS division is run exclusively by white men and nothing the Company can do at this point can change the implications of this.  The willingness to allow such a disparity to exist year over year is further proof of the *de minimis* value the Company places on its alleged commitment to equity and diversity.

52.     It is within the context of this white male-centric leadership that the systemic race-based discrimination at Assurant against Plaintiffs was allowed to develop and flourish.  The discriminatory employment practices that disproportionately affect Black employees' compensation at Assurant include, *inter alia*:

> (i)     a discretionary compensation system that disfavors Black employees;
>
> (ii)    a discretionary promotion system that disfavors Black employees; and
>
> (iii)   a discretionary performance evaluation system that disfavors Black employees.

53.     Such systemic failures allow white male executives to perpetuate race discrimination that has and continues to cause Plaintiffs and similarly situated Black employees at Assurant to experience the following:

> •     Unequal base salary for substantially the same work as compared to white employees;
>
> •     Unequal bonuses for substantially the same work as compared to white employees;
>
> •     Unequal benefits and other forms of compensation as compared to white employees;

- Unequal promotions and opportunities for advancement as compared to white employees;

- Unequal opportunities for development as compared to white employees; and

- Unequal performance evaluations as compared to white employees.

54.     Within Dealer Services only those in leadership positions have the authority to make meaningful contractual agreements and negotiate payment terms for fees and commissions. Such positions are occupied exclusively by white males.

55.     Moreover, white employees enjoy greater opportunities for client development than Black employees.  Black employees, including Plaintiffs, are not given the same opportunities to secure substantial new business as are given to white men.  As detailed below, the above practices, which remain pervasive and exist throughout ADS, resulted in substantial and ongoing harm to Plaintiffs.  Moreover, there is nothing in this conduct that comports with Assurant's marketing strategy about its "four core pillars" or alleged commitment to being a "responsible employer" that values "diversity, equity and inclusion."

## IV.    **DARIS STEEN**

56.     Mr. Steen is a highly accomplished and regarded businessperson with years of experience in the automotive financial industry.  Mr. Steen served in the U.S. Marines Corps. and spent almost an entire year in the hospital recovering from injuries suffered during a joint military deployment.  He retired from the Marines in 1995, and thereafter graduated from Pepperdine University, and then earned a Master of Business Administration ("MBA") degree in Finance from National University in San Diego.

57.    In 2007, after gaining experience in the finance department of AutoNation for a number of years, Mr. Steen was hired as a Financial Service Specialist by The Warranty Group ("TWG"),[1] now Assurant.

58.    For the last 15 years, Mr. Steen has reported directly to Mr. Brown.  During this time, Mr. Brown reported directly to Mr. Bauer and Mr. Amendola.

59.    In 2008, Mr. Steen was promoted to a "District Manager" ("DM") position.  He held that position for three years, and in January 2011, Mr. Steen was promoted to "Area Manager" ("AM") in the Company's "Southeast Region," that included Florida, Puerto Rico, Southeast Georgia and South Alabama.

60.    Incredibly, in 2011 Mr. Steen was the sole Black employee promoted to the AM position.  Shockingly, more than 10 years later, Mr. Steen remained the sole Black employee in the AM position at Assurant.

61.    There is simply no reasonable or legitimate explanation as to why only white employees were promoted to the AM level and above.

A.    **Assurant Was a Top Performer Yet Assurant Refuses to Promote Mr. Steen**

62.    Since 2011, Mr. Steen had one goal – to be promoted to the next level at Assurant – specifically, to become a "Regional Manager."

63.    Inexplicably, year after year, Mr. Brown, Mr. Bauer and Mr. Amendola refused to promote Mr. Steen.  Such annual refusals were confounding to Mr. Steen because by all objective metrics, he was an outstanding field sales employee, who consistently ranked as the number one or two salesperson across the country, each year.  Assurant was fully aware of Mr. Steen's

---

[1]    From 2007 through 2017, Mr. Steen and Mr. Brown were employed at "The Warranty Group" or "TWG," purchased by Assurant in 2018. Within Assurant, what was essentially TWG was re-branded as "Assurant Dealer Services" or "ADS."

performance record, his stellar performance reviews and the results of all inter-company "sales competitions" that Mr. Steen regularly won.

64.    By way of example only, Assurant sent Mr. Steen and other AMs[2], monthly charts ("Charts") for various sales metrics, including one for bonuses earned in connection with "New Business" ("NB").  Employees were told that the Charts represent the "ranking" of the AMs based on objective data obtained from existing contracts and agreements that only senior executives at Assurant are privy to.

65.    Employees also were told that the "ranking" is based on the annual "Field Sales Incentive Program" documents that purport to explain how the field sales employees' compensation is calculated.  Notwithstanding such policies, not a shred of data is provided to employees when they receive these monthly charts, and the Charts are clearly generated in a Word document by manually inserting numbers and assigning a rank to an employee name.

66.    In 2021, month after month, Mr. Steen occupied the Number One Rank.

---

[2]    As indicated above, across the U.S., all other AMs were white.

**NB Bonus Area Managers Ranking Totals 2021 YTD (3/29/2021)**

| Ranking | Area Manager | Appointments | Earned |
|---|---|---|---|
| 1 | Daris Steen | 5 | $12,375.00 |
| 0 | Brett Malbrough | 0 | $0.00 |
| 0 | Jim McCroskey | 0 | $0.00 |
| 0 | Chris Renner | 0 | $0.00 |
| 0 | Thomas Bond | 0 | $0.00 |
| 0 | Phan Dang | 0 | $0.00 |
| 0 | Antonio Concepcion | 0 | $0.00 |
| 0 | Matt Balbo | 0 | $0.00 |
| 0 | Charles Atkin | 0 | $0.00 |
| 0 | Sean Barnes | 0 | $0.00 |
| 0 | Mike Ponzi | 0 | $0.00 |
| 0 | John Hart | 0 | $0.00 |
| 0 | Manny Emami | 0 | $0.00 |

**NB Bonus Area Managers Ranking Totals 2021 YTD (4/26/2021)**

| Ranking | Area Manager | Appointments | Earned |
|---|---|---|---|
| 1 | Daris Steen | 5 | $12,375.00 |
| 2 | Manny Emami | 1 | $1,125.00 |
| 0 | Brett Malbrough | 0 | $0.00 |
| 0 | Jim McCroskey | 0 | $0.00 |
| 0 | Chris Renner | 0 | $0.00 |
| 0 | Thomas Bond | 0 | $0.00 |
| 0 | Phan Dang | 0 | $0.00 |
| 0 | Antonio Concepcion | 0 | $0.00 |
| 0 | Matt Balbo | 0 | $0.00 |
| 0 | Charles Atkin | 0 | $0.00 |
| 0 | Sean Barnes | 0 | $0.00 |
| 0 | Mike Ponzi | 0 | $0.00 |

**NB Bonus Area Managers Ranking Totals 2021 YTD (5/24/2021)**

| Ranking | Area Manager | Appointments | Earned |
|---|---|---|---|
| 1 | Daris Steen | 4 | $9,375.00 |
| 2 | Manny Emami | 1 | $1,125.00 |
| 2 | Jim McCroskey | 1 | $750.00 |
| 0 | Brett Malbrough | 0 | $0.00 |
| 0 | Chris Renner | 0 | $0.00 |
| 0 | Thomas Bond | 0 | $0.00 |
| 0 | Phan Dang | 0 | $0.00 |
| 0 | Antonio Concepcion | 0 | $0.00 |
| 0 | Matt Balbo | 0 | $0.00 |
| 0 | Charles Atkin | 0 | $0.00 |
| 0 | Sean Barnes | 0 | $0.00 |
| 0 | Mike Ponzi | 0 | $0.00 |

**NB Bonus Area Managers Ranking Totals 2021 YTD (8/23/2021)**

| Ranking | Area Manager | Appointments | Earned |
|---|---|---|---|
| 1 | Daris Steen | 4 | $9,375.00 |
| 2 | Jim McCroskey | 2 | $3,750.00 |
| 3 | Manny Emami | 2 | $1,875.00 |
| 3 | Mike Ponzi | 1 | $2,250.00 |
| 3 | Matt Balbo | 1 | $2,250.00 |
| 0 | Brett Malbrough | 0 | $0.00 |
| 0 | Chris Renner | 0 | $0.00 |
| 0 | Thomas Bond | 0 | $0.00 |
| 0 | Phan Dang | 0 | $0.00 |
| 0 | Antonio Concepcion | 0 | $0.00 |
| 0 | Charles Atkin | 0 | $0.00 |
| 0 | Sean Barnes | 0 | $0.00 |

67. As is obvious, for most months, Mr. Steen's performance earned him bonus amounts not just 10% or 50% or even 100% more than his peers, but 250%, 500% and even 1000% + more than his peers, who are all white.

68. The Charts speak for themselves, but by way of example, in May 2021, Mr. Steen was ranked first earning $9,375. The next closest AM was Manny Emami, who earned $1,125. Mr. Steen earned 833% more that month than the second ranked AM. In third place, Jim McCroskey earned $750, just 8% of the amount that Mr. Steen earned. The remaining nine AMs earned zero in NB that month. The disparity between Mr. Steen's success as compared to the other AMs is nothing short of shocking.

69. Nevertheless, despite Mr. Steen's consistent annual performance, Assurant refused to promote him.

70. The Charts also were used by Assurant to award incentives to Plaintiffs, including high-value items such as Rolex watches. Despite the numbers set forth above, and Mr. Steen's consistent stellar performance in 2021, he learned that he was not the recipient of the Rolex, instead it went to Charles Atkins, who of course, is white.

71. Worse, the only AMs that Assurant promoted to the Regional manager level and above were white. Notably, these employees not only failed to achieve sales numbers anywhere close to Mr. Steen, but most had less experience. In addition, even when the higher-level jobs required graduate degrees, Assurant promoted white AMs without degrees rather than Mr. Steen, who has an MBA.

72. These promotions provided Mr. Steen's less-qualified white colleagues with substantially more responsibility, supervisory authority and higher incomes as compared to Mr. Steen.

73. Too many examples exist to list here of similarly situated white employees as compared to Mr. Steen being promoted over Mr. Steen. For example, Tim Bonko was a white AM at Assurant. In 2015, after working as an AM for just 4.5 years, he was promoted to Regional Vice President. Mr. Steen should have been promoted into this position. While Mr. Bonko had comparable experience as an AM, Mr. Steen had significantly outperformed Mr. Bonko on an annual basis. Nevertheless, Mr. Bonko, who was a good friend of Mr. Brown's both inside and outside of work, received the recommendation for the promotion by Mr. Brown. There were no interviews for the promotion, much less an objective process. Mr. Steen was never interviewed. Mr. Bonko simply was appointed. Mr. Bauer and Mr. Amendola concurred and authorized the promotion.

74.    Mr. Bonko's brother-in-law, another white male, Sean Barnes, also was promoted over Mr. Steen.  Mr. Barnes, who graduated college in 2008 and is more than 25 years younger than Mr. Steen, worked as an AM for 5 years.  During his time, Mr. Barnes's lack of achievements left him at the bottom of the performance list, especially as compared to Mr. Steen. Incredibly, in October 2021, Mr. Barnes was promoted to Regional Vice President.  As evidenced from the Charts *supra*, Mr. Barnes brought in zero dollars and zero appointments for the year in connection with NB.  When Mr. Barnes was promoted, Mr. Steen had *five more years* of experience than Mr. Barnes as an AM.  Yet it was Mr. Barnes who was viewed highly enough to be promoted to Regional Vice President over Mr. Steen. Upon information and belief, Mr. Brown, Mr. Bauer and Mr. Amendola made the decision to promote Mr. Barnes over Mr. Steen.  Mr. Steen was never interviewed.  Again, there was no process in connection with the promotion, it simply "happened."

75.    Also at the bottom of the 2021 AM ranking total was another white male, Chris Renner.  Mr. Renner began working as an AM only in 2018 – *seven years after* Mr. Steen was promoted to AM.  In January 2022, it was announced that Mr. Renner was promoted to a Regional Sales Manager position.  Once again, Assurant failed to promote Mr. Steen, instead opting for a less experienced, less tenured, underperforming white male.  Mr. Renner's inexperience, rank as a poor performer, lack of a degree other than undergraduate, was not a deterrent for Assurant to promote Mr. Renner into the Regional Sales Manager position, now earning substantially more than Mr. Steen.  Upon information and belief, Mr. Brown, Mr. Bauer and Mr. Amendola made the decision to promote Renner.

76.    Significantly, Assurant's internal job "posting" for the regional position reveals that the posting "start" date was December 20, 2021, yet the listing claims the job posting "end" date was December 21, 2021.  When Mr. Steen contacted HR to find out why he was not made aware

of the regional position and the ability to apply, he was told that Assurant did not have the "ability" to email everyone about it. The decision to promote Mr. Renner was subjectively made without any process for other employees to seek the position. Mr. Steen was never interviewed.

77.     Ty Viger, a white male, started at the Company as an Account Specialist in October 2011, nine months after Mr. Steen was promoted to an AM. Mr. Viger was promoted to DM and then to AM. Less than three years as an AM apparently was enough "experience" for Assurant to promote Mr. Viger to a Regional Vice President position. At the time Mr. Viger was promoted, Mr. Steen had two additional years of experience as an AM. Furthermore, Mr. Viger's performance and educational attainment is far below that of Mr. Steen. It is difficult, if not impossible, to believe that anything other than the fact that Mr. Viger is white was considered in promoting a less-qualified employee over Mr. Steen. Mr. Steen was never interviewed.

78.     In 2010, Joe Pazienza was hired as an AM. Mr. Steen consistently outperformed Mr. Pazienza in signing new clients and securing sales. Every year leading up to Mr. Pazienza's promotion, Mr. Steen always ranked higher. Yet, Mr. Steen was not the employee who was brought up the ranks to the Regional Vice President position. Rather, in accordance with Assurant's history and practices, a more-qualified Black employee was overlooked for a less-qualified, white one. Mr. Steen was never interviewed. When Mr. Steen learned of Mr. Pazienza's new role at the Company, he asked management why he was never even considered. Mr. Bauer told Mr. Steen that it was his decision about who to promote. Mr. Bauer threatened Mr. Steen to stay in his place if he wanted to keep his job.

79.     Steve Imhoff, another white male, progressed through the Company at every level: (1) Financial Service Specialist, (2) District Manager, (3) Area Manager, (4) Vice President of Business Development and (5) Regional Vice President. He climbed up the hierarchy, regardless

of the fact that Mr. Imhoff was often unsuccessful in his respective roles.  Confoundingly, Mr. Imhoff was permitted to transition laterally from the Vice President of Business Development to the Regional Vice President role.  This occurred even after Mr. Imhoff failed to bring in any clients or business.  His role was the Vice President of *Business Development*, and he was unable to sign a single client (*i.e.*, develop the business).  Nevertheless, his lateral move to Regional Vice President – a role which could have gone to reliable and effective employee such as Mr. Steen – was approved without issue. Mr. Steen was never interviewed.

80.    Appallingly, the above examples are not an exhaustive list.

**B.    Mr. Steen Complains and Retaliation Escalates**

81.    Given the ubiquitous nature of the discrimination, it is not possible to identify and list each individual incident that Mr. Steen was subjected to during the last 14.5 years.  As is evident, however, there is no possibility that the white executive leaders did not know the pervasiveness of the insidious discrimination.  Similarly, the senior leadership was aware that Mr. Steen dared to complain about the unequal treatment.

82.     Shamelessly, after Mr. Steen or other Black employees dared to speak up, they were labeled with the all too familiar "angry Black man" stigma and described as difficult to work with.

83.    As part of Assurant's required annual performance reviews, employees submit comments and self-assessments.  Mr. Steen began to include in these reviews, his complaints about racial discrimination and his failure to be promoted.

84.    On numerous occasions over the years Mr. Steen wrote in his reviews that he "hoped" an objective merit system would be utilized by the Company. By way of example only, in his 2019 Performance Evaluation (PE), Mr. Steen wrote,

> **I hope that 2020 brings more opportunity for diversity and baseline expectations with promotions within the automotive field ranks.**

85.    His manager, Mr. Brown, failed to acknowledge or respond.

86.    Similarly, on November 15, 2021, Mr. Steen, dared to question in his performance review that if he is a "leading AM," why he was not ranked "exceptional," when he wrote:

> I am currently leading most AMs in the country with a #1 & #2 ranking. I would like someone to explain to me what does it take to receive an "Exceptional" review.  Also, I would like to know how promotions are determined? I have been ranked in the top 3 AMs in 11 of 14 years and I have never been interviewed for Regional Vice President. My level of retail experience equals or exceeds most AMs.  Also my education level exceeds other AMs.  It's fair to ask the criteria for promotions.

87.    Again, Mr. Brown ignored the questions.

**C.    Tom Bond's "Slavery Was Not That Bad" Comments And Semi-Automatic Guns at Zoom Meetings**

88.    Disgustingly, Tom Bond, an AM based in Atlanta repeatedly engaged in biased statements to employees, including to Mr. Steen.[3]  By way of example only, Mr. Bond remarked to Mr. Steen that he did "not understand" why people "complained about slavery."

89.    Shockingly, Mr. Bond said:

> **The [African] slaves *should have been happy* that they were no longer in Africa.**
>
> **Slavery was *not all that bad* for slaves because they had food and shelter from slave owners**.

90.    Such vile and painful comments deserved no response, and Mr. Steen gave none to Mr. Bond.

---

[3]    Mr. Bond made similar comments to Mr. Judson.

91.    Mr. Steen wanted to complain about these comments, but he knew that Mr. Bond was a close friend of Mr. Brown's. He knew that objecting to Mr. Bond's comments likely would result in retaliation, and he felt helpless to remedy the situation.

92.    Equally offensive and racist, Mr. Bond openly complained to employees, including Mr. Steen about the fact that "white people" could not buy enough "ammunition," because for "some reason," there was a shortage.

93.    Mr. Bond also would comment to employees, including Mr. Steen, that white citizens had the right to bear arms in the U.S., and that white people in the U.S. were still the "majority."

94.    Like most companies, Covid-19 caused Assurant to transition to Zoom meetings. During a Zoom meeting that Mr. Brown was leading, Mr. Bond had three of his semi-automatic firearms on top his desk. Shocked, Mr. Steen was speechless. Mr. Judson also was on the Zoom.

95.    Another white manager Eric Feussner asked Mr. Bond about the three guns. Mr. Bond proudly picked up one of his firearms to it show off and appallingly, pointed it into his camera at the employees. Mr. Steen and Mr. Judson were horrified.

96.    Mr. Feussner felt emboldened to volunteer that he also owns semi-automatic weapons.

97.    Given Mr. Bond's running commentary about white people being the "majority," and remarks that "slaves" did not have it "that bad," waving semi-automatic guns around during a Zoom, as well as pointing a gun directly into the camera, was highly disturbing and upsetting to Mr. Steen and to Mr. Judson.[4]

---

[4]    There were two other Black employees on the Zoom, both junior to Mr. Bond.

98.    Even though he previously had been afraid to complain about Mr. Bond to Mr. Brown, Mr. Steen could not stay silent about this incident.

99.    However, when Mr. Steen complained about what happened to Mr. Brown, <u>Mr. Brown became mad at Mr. Steen</u>.  Mr. Brown, who supervised Mr. Bond, defended Mr. Bond's conduct, and refused to report the event to HR.

100.    Mr. Steen continued to ask Mr. Brown to report what had happened to HR.

101.    Finally, after realizing that Mr. Brown was not going to do anything, Mr. Steen sent HR an email to report the weapons display and Mr. Bond's actions regarding the guns during the Zoom.

102.    Outrageously, HR had one call with Mr. Steen and then told him it was resolved.

103.    Worse, after Mr. Steen sent HR the email, <u>Mr. Brown refused to speak to Mr. Steen</u>.

104.    Specifically, Mr. Brown – Mr. Steen's *direct manager* – intentionally refused to talk to Mr. Steen or answer his telephone calls for months after this incident.

105.    When Mr. Steen contacted HR to complain that his direct supervisor was refusing to speak to him, which of course he needed to do to perform his job, HR responded by telling Mr. Steen to <u>text or email Mr. Brown</u>.

106.    Such utter noncompliance with the laws designed to protect employees like Mr. Steen is more than horrible, it is unlawful and exposes Assurant to substantial liability.

**D.    <u>Mr. Steen Is Demoted in January 2022</u>**

107.    After working at Assurant for almost 15 years, on January 18, 2022, Mr. Steen, along with employees from across the U.S. were told to report to Houston for a "meeting."  When he arrived, Mr. Steen remained uninformed about the nature of the meeting or the agenda.  Leading

the meeting were Mr. Amendola, Mr. Bauer, Jeff Strickland, and Sean Barnes.  Although Mr. Brown should have been there, he was sick and appeared only *via* Zoom.

108.    Mr. Steen learned that the AM position was "eliminated," along with the Senior DM position.  He was demoted to the DM position effectively immediately.

109.    As such, Mr. Steen went from a role immediately below the Regional Vice President level, to a title that placed him two levels below his AM level.  It was here that Mr. Steen realized that Mr. Renner, a former AM alongside Mr. Steen, rather than be demoted along with Mr. Steen, was promoted to a Regional Manager position.

110.    Appallingly, at the same time Mr. Steen was demoted, Mr. Steen learned that Mr. Brown had been promoted.

111.    Mr. Brown was promoted to manage both the Atlanta region and Southeast region.  Given the volume of sales, employees knew that the Atlanta and Southeast regions easily could have been divided, allowing another employee such as Mr. Steen, the opportunity to be assigned a region.

112.    Instead of giving one of the regions to Mr. Steen, again without explanation, it all went to Mr. Brown.

113.    Upon information and belief, these decisions were made by Mr. Bauer, Mr. Amendola, as well as Mr. Strickland, a Senior Vice President.

114.    In addition to Mr. Steen's demotion in title and position, he was also penalized in the terms and conditions of his employment.  First, Mr. Brown immediately stripped Mr. Steen of his most lucrative dealership accounts, including Napleton and Sansing which Mr. Steen had worked on for *years*.

115.    In place of his longstanding clients, Mr. Brown "assigned" Mr. Steen a number of the lowest performing dealerships, with the lowest fees available and therefore the least lucrative accounts.  For example, Mr. Brown assigned him the King Auto Group, one of Assurant's most problematic dealers, with more complaints about this dealer group than all the other dealerships in Florida.

116.    When Mr. Steen attempted to communicate with Mr. Brown about the removal of his accounts and replacement with troubled, non-revenue producing accounts, Mr. Brown's response was simply to *not respond*.[5]

E.    **Mr. Steen's February 2022 Email and the "Investigation"**

117.    After the demotion, and knowing that Mr. Brown and his supervisors, Mr. Bauer and Mr. Amendola, had ignored Mr. Steen's complaints for years, Mr. Steen wrote to the top executives at Assurant for their division, Martin Jenns and Mr. Strickland about the racial discrimination.  Below, are the names of the recipients, the subject line and the subject headings of his email:

---

[5]    Sadly, it is a recurring theme that Mr. Brown, a Senior Regional manager of multiple states at Assurant unprofessionally "handles" or otherwise "manages" his employees by giving them what teenagers call "the silent treatment."  It is confounding that this individual, a senior executive for over 15 years, can behave this way and remain in this position at Assurant. Recently, Mr. Brown was promoted.

**From:** Daris Steen
**Sent:** Tuesday, February 1, 2022 10:47 AM
**To:** Martin Jenns <martin.jenns@assurant.com>
**Cc:** John Laudenslager <John.Laudenslager@assurant.com>;
Jeffrey Strickland <Jeffrey.Strickland@assurant.com>; Alecia
Bailey <alecia.bailey@assurant.com>; Ana Rosado Reyes
<Ana.Rosado@assurant.com>
Subject: **Racial Disparity in pay and promotions among ADS
field force**

- Compensation Disparity among African American / People of Color

- Management Promotions

- Hostile Work Environment

- District Manager Issues

- Non- Diverse Session Plan

118.    Not surprisingly, but horribly, on May 24, 2022, Ana Rosado-Reyes, a Vice

President and one of the recipients of his email, sent Mr. Steen a letter stating that Assurant had

"investigated" his complaints based on his February 1, 2022 email and concluded as follows:

> The investigation concluded that none of the allegations in your
> February 1, 2022 email were substantiated. As you know, the
> Company maintains several mechanisms for raising concerns.
> Please do not hesitate to utilize those report mechanisms in the
> future should any further issues arise that cause you concern.

## V.    WILLIAM JUDSON, SR.

119.    Mr. Judson, age 63, is a former professional NFL football player.[6]  In 2011, he was

hired at Assurant to work as a DM.  At all relevant times, his immediate supervisor was Mr. Bond,

who reported directly to Mr. Brown.

120.    Mr. Judson experienced ubiquitous racial discrimination under Mr. Bond's

supervision.  For example, Mr. Bond told Mr. Judson one day as they were driving to appointments

---

[6]    He played for ten years as a cornerback for the Miami Dolphins.

for new business that the "good white citizens" like himself had the right to bear arms against others and said that "white citizens" are still the "majority in America."

121.    That same day, Mr. Bond asked Mr. Judson "how he felt" about "slavery."  Mr. Judson could not speak in response to this horrific question.

122.    Mr. Bond told Mr. Judson that he believed "**slaves**" had "**had it made**" because they were "**well taken care of**."

123.    Mr. Bond, who said too many outrageous, racist statements to Mr. Judson to include in this Complaint, also made threats to Mr. Judson that he should not feel protected from being fired because of his race and age – as if such classifications were the only reason Mr. Judson had a job.

124.    In fact, Mr. Bond told Mr. Judson that notwithstanding his age or skin color, that: "**I will figure out a way to get rid of your old black ass.**"

125.    **Mr. Bond** regularly told Mr. Judson that he wanted to "get rid of" him because he was "too old."  During two different weekly meeting calls in September and October of 2021, Mr. Bond specifically told Mr. Judson that Assurant was looking to "get younger."  Further because Mr. Judson was allegedly the oldest DM at Assurant, Mr. Bond said that his time at Assurant was "soon coming to an end."

126.    Around this time Mr. Bond removed five accounts from Mr. Judson and re-assigned them to a younger white employee, Ryan Ruff. Mr. Bond told Mr. Judson he did this because Mr. Judson was "too old and beat up from playing football" to handle the responsibilities of the job. Mr. Bond felt it acceptable to encourage Mr. Judson to quit because he was "too old."

127.    On several occasions, Mr. Bond called Mr. Judson an "old, beat up ex-football player" that Mr. Bond needed to figure out a way to get "rid of."

128.    During Mr. Judson's 10 years of working for Mr. Bond, on a near daily basis, including his very first day of work, he heard Mr. Bond say to him and other employees that "Whatever goes on in Atlanta … stays in Atlanta."  Mr. Bond repeatedly told employees that he did not want to "get caught with his pants down."

129.    When Mr. Judson bypassed Mr. Bond and asked Mr. Brown about being promoted, which he did for a number of years, Mr. Brown invented a false "protocol" to explain why Mr. Judson was not getting promoted, despite his strong work performance.

130.    Mr. Brown told Mr. Judson that he was not promoted to a Senior DM level because Assurant had a prerequisite that he first needed to be a "Training District Manager."  Upon information and belief, such a position has never existed at Assurant.  Mr. Brown knowingly made such false statements to Mr. Judson.

131.    When Mr. Judson, of course, was able to refer to other employees that did not need to be Training District Managers before a promotion, including but not limited to Michael McAdoo (a white DM), Mr. Brown had no explanation.

132.    When Mr. Judson dared to complain about his compensation being lower than other similarly situated DMs reporting to Mr. Bond, Mr. Brown's quick excuse was that Mr. Judson worked in a geographic region that paid "the least" amount of money – to all employees.  Not a shred of objective evidence supports this statement and Mr. Brown never provided any proof to Mr. Judson.

133.    Finally, despite treating Mr. Judson unfairly because of the color of his skin and age, Mr. Bond believed it was acceptable to penalize Mr. Judson for his ongoing physical disabilities.  During his employment Mr. Judson started to experience concussion-like symptoms that doctors believed were associated with concussions Mr. Judson suffered during his football

career.  In addition to taking time off for doctor's visits for his developing conditions, Mr. Judson had to use PTO days to be examined by physicians affiliated with the NFL.  Once Mr. Bond learned about this, he regularly made abhorrent comments to Mr. Judson.  By way of example only, Mr. Bond frequently suggested, without any basis in fact, that Mr. Judson was losing his memory, would call him a "fucking idiot," and say that he lacked the "mental capacity" to perform his job at Assurant.

134.    During the pandemic, Mr. Judson was concerned about getting sick, and expressed his concerns about his age and high blood pressure to Mr. Bond.  Even though Assurant's stated "policy" was that employees were permitted to work from home, Mr. Bond threatened Mr. Judson that he would be fired if he did not personally work "in the field."  "In the field" meant that Mr. Judson had to go in person to the various auto dealerships in and around Atlanta.

135.    Mr. Bond threatened Mr. Judson that if he needed an "accommodation" to work from home, that Mr. Judson "should just quit."  Mr. Bond would comment openly that the "left-wing media is blowing up the COVID-19 pandemic" and that the virus was "just not that serious."

### A.    Mr. Judson Complains to HR and Is Fired

136.     In or about October 2020, Mr. Judson complained to HR about Mr. Bond. Specifically, Mr. Judson contacted HR employees Christine Bieller and Ms. Rosado-Reyes and described Mr. Bond's heinous conduct as set forth above.  Mr. Judson reported that he believed Mr. Bond was discriminating against him because of his race, age and medical issues.

137.    Mr. Judson asked HR if he could be transferred to another manager.

138.    The HR employees told Mr. Judson that they were "investigating [his] complaints" and that they would contact him with "further instructions and information."

139.    Subsequent to reporting Mr. Bond to HR, Mr. Bond escalated his discriminatory conduct.  Specifically, right after Mr. Judson complained, Mr. Bond removed accounts from Mr. Judson and reassigned them to other DMs, for no legitimate reason.  This directly reduced Mr. Judson's compensation and ability to earn money.

140.    Worse, for no legitimate reason Mr. Bond told Mr. Judson that he would not receive the annual performance raise that Mr. Judson had received in each previous year that he worked at Assurant.  Mr. Bond went out of his way to tell Mr. Judson that he was the only DM that would not receive an annual performance raise – all the other DMs would receive it.

141.    In December 2020, not hearing from HR about the status of any investigation for several months, and continuing to experience Mr. Bond's retaliation, Mr. Judson reached out to Mr. Brown.  Mr. Judson told Mr. Brown about his complaint to HR and said that Mr. Bond was retaliating against him.

142.    Mr. Judson asked Mr. Brown to transfer him away from Mr. Bond.  In response, Mr. Brown appeared to be "alarmed" at what he heard and upset that Mr. Judson had accused Mr. Bond of "retaliation," saying that "retaliation" was a "big deal."

143.    Mr. Brown told Mr. Judson that if was accusing Mr. Bond of retaliation, then he also must be accusing Mr. Brown of retaliation.  Concerned about this unexpected accusation, Mr. Judson tried to assure Mr. Brown that he was not accusing Mr. Brown of retaliation, but rather was asking to be transferred.

144.    Four days after this conversation, on January 26, 2021, Mr. Brown and an HR employee called Mr. Judson, and fired him.  Mr. Brown disgustingly said he was being fired for several miscellaneous document and record keeping failures – purported infractions that other DMs regularly engaged in but received no repercussions for, much less terminations.

145.    Unbelievably, after Mr. Judson submitted a Charge to the EEOC *pro se*, on May 25, 2021, and detailed the above facts about the discrimination and retaliation he experienced at Assurant, in January 2022, Assurant inexplicably fired his son, William Judson, Jr., who had been working at Assurant for six years.

146.    Unquestionably, the decision to terminate Mr. Judson's son was made maliciously and intentionally, in blatant retaliation for Mr. Judson's decision to file with the EEOC.

## VI.    <u>RICHARD STEIN</u>

147.    Mr. Stein received his Bachelor of Arts degree in criminal justice from Alabama State University in 2005 and a Masters degree in sports management, marketing and administration from Troy University in 2007. Before joining Assurant, Mr. Stein worked at Enterprise Rent-A-Car for five years.  He excelled at his job, and was promoted on six separate occasions during his five years there.

148.    In 2014, Mr. Stein began working for Assurant as a Finance and Insurance ("F&I") Specialist.  This initial "F&I training program," that all employees are supposed to undergo before working as a DM, was supposed to last no more than 6 months.

149.    During his "training," however, Mr. Stein had no consistent supervisor, and he was forced to remain in the training while white employees were promoted ahead of him to the DM position.   Indeed, based on his sales numbers that were recorded on a regular basis, he outperformed these white trainees, yet was forced to remain in the program for 11 months. In addition, he learned from another white employee that Mr. Stein was paid between fifteen to twenty percent (15-20%) less than his white peer.  This white coworker had less sales experience than Mr. Stein.

150.    When Mr. Stein was hired, he was told by Craig Yates, the Regional Vice President who interviewed Mr. Stein for the F&I specialist position, that all trainees were paid the same compensation and the starting compensation was "not negotiable." Clearly, as between a white employee and Mr. Stein, this was not true.

151.    In 2015, Mr. Stein advanced to the DM position.

152.    From 2015 through February 2022, his immediate supervisors were Lee Perez and Mr. Renner, white males. Both Mr. Perez and Mr. Renner were AMs and they reported directly to Mr. Brown.

153.    Since 2015, Mr. Stein has not been promoted.

154.    When hired, Mr. Stein was promised that he would be assigned to the Tampa/Florida district. However, this did not happen. Instead, Mr. Stein who resided in Tampa, was assigned to a sales district in Georgia and South Carolina.

155.    Mr. Stein again voiced his preference for living and working in Tampa or any other area in Florida, but was told by both Mr. Brown and Mr. Yates that if he did not accept the assignment and move to Savanah, Georgia, he would lose his job at Assurant.

156.    Mr. Brown promised Mr. Stein on more than one occasion that he would be re-assigned to the Tampa or Florida district, the "first opportunity" that opened up.

157.    Mr. Stein knew that as a Black employee, he would have to work twice as hard in certain geographic areas where the automotive sales industry was almost exclusively dominated by white men. By way of example only, the general manager ("GM") of a prestigious dealership in Savannah that did business with Assurant, refused to call Mr. Stein by his name. Instead, he was always called **"boy."**

158.    When Mr. Stein told Mr. Perez about this GM and being called "boy," the disgusting response from Mr. Perez was that the GM "did not mean it."  Outrageously, Mr. Perez told Mr. Stein that he needed to "earn the respect" of the GM, and that he should not "take it personal."  In addition to not remedying the discrimination, Mr. Perez reminded Mr. Stein that this dealership was a "really important account that has been a client of the company for over 40 years."

159.    Mr. Stein knew that if he had complained to Mr. Renner or Mr. Brown about the GM, the result would be that Mr. Stein would be penalized, and nothing would be said to the GM or anyone else at the dealership.  In fact, in 2017, the same GM complained about Mr. Stein to Mr. Renner and Mr. Brown.   The GM's false accusations resulted in Mr. Stein being verbally reprimanded and threatened to be placed on a PIP (performance improvement plan). Once again, Mr. Stein dared not complain about being called "**boy**."

160.    Cold calling auto dealerships was a necessary part of Mr. Stein's job, and in the more rural areas of southern Georgia, the managers that Mr. Stein needed to interact with were exclusively white men.  When Mr. Stein and Mr. Renner would go cold calling together, for no apparent reason, these white managers would talk to Mr. Renner, but usually ignored Mr. Stein.  Again, despite the obvious hurdles Mr. Stein faced in his geographic sales territory, his requests to be transferred to Florida were rejected.

161.    Eventually, in 2017, after speaking to Mr. Renner and Mr. Brown, Mr. Stein moved back to Jacksonville, Florida, but his sales territory was not changed.  On a weekly basis, Mr. Stein travelled back and forth to Savannah.  Although Mr. Stein knew of white DMs who resided several hours away from their sales territories and were reimbursed by Assurant for their hotel and travel fees, Mr. Renner and Mr. Brown refused to reimburse Mr. Stein for any such costs.

162.    As a result, Mr. Stein spent approximately $1,000 a month on travel and living costs in Savannah for more than 4 years.

163.    On several occasions, job opportunities opened up in Florida that would have allowed Mr. Stein to work from his residence rather than travelling many hours each week and staying in hotels. Despite Mr. Brown's promises, these positions were not offered to Mr. Stein.  For example, in late 2017 Mr. Brown awarded the Orlando sales region to a newly hired white employee, Zach Ward, bypassing Mr. Stein.

164.    In December 2021, Mr. Stein received a job offer from another company that offered competitive compensation.  Knowing that other white employees had received pay increases after they told Assurant about competitive job offers, Mr. Stein believed that he would receive similar treatment, especially because of his exceptional performance over the years.

165.    Instead, rather than responding with an increase in pay, Mr. Brown merely asked Mr. Stein not to quit and promised he would get him "more money" the following January. Subsequently, Mr. Brown gave Mr. Stein a negligible salary increase.  During these discussions, when Mr. Stein again raised the issue of not being transferred to Florida, Mr. Brown's excuse was that he did not give these Florida sales regions to Mr. Stein because he was doing such an exceptional job that Mr. Brown feared Assurant would lose important Georgia and South Carolina clients if Mr. Stein was transferred out.

166.    In contrast, Mr. Stein knows of at least two white DMs that told Mr. Brown that they would quit and join competitors if they did not receive more money.  After these demands for increased pay, these white employees each were given raises of approximately $100,000.  Worse these two white DMs, Ryan Ruff and Zach Ward started at Assurant with substantially higher compensation than Mr. Stein, despite their lesser qualifications and/or experience.

167.    For example, Mr. Ruff started in November 2018, having worked for the same auto dealership in Tullahoma, Tennessee since the time he graduated college until starting at Assurant. Mr. Ward started at Assurant in November 2017, and has no undergraduate degree, including even a two-year degree.  Additionally, he worked just two years at any job (in a junior role in the finance department of a single auto dealership) before starting at Assurant.  Incredibly, Mr. Brown assigned Mr. Ward the Orlando, Florida sales region bypassing Mr. Stein, when Mr. Brown knew that Mr. Stein had specifically asked if he could be considered for the Orlando region.

168.    After Assurant gave Mr. Ruff and Mr. Ward substantial salary raises to retain them, these white employees are now paid more than double what Mr. Stein earns. Specifically, for each $1 that Mr. Stein earns, Mr. Ruff and Mr. Ward earn $2, or more.

169.    In addition to these two white employees, Mr. Stein knows of another white employee, Dane Parrott, who started at the Company in 2017, but inexplicably was paid substantially more at his hire than Mr. Stein.  Upon information and belief, Mr. Parrott was paid a base of $80,000 as compared to Mr. Stein's base of $54,500, for the same position.

170.    Also, after three years, Mr. Brown promoted Mr. Parrott to a Senior DM role.  Since 2015, Stein has consistently stated on his annual performance evaluations, reviewed by Mr. Brown and Mr. Renner, that his goal is to be promoted to Senior DM and advance his career further with Assurant.  Mr. Stein was never considered for the promotion.

171.    Another white co-worker, Michael McAdoo, lives in Pensacola, Florida, and his sales territory is in Tennessee/Alabama.  In contrast to Mr. Stein's complete lack of reimbursement for travel to and from his sales territory, Mr. Stein learned that Mr. McAdoo is reimbursed by Assurant for his travel to and from Tennessee/Alabama, whether by car or plane.  Upon information and belief, this reimbursement to Mr. McAdoo has been ongoing for more than 6 years.

172.    Meanwhile, Mr. Stein has paid $1000 a month from his own salary. No basis exists for this unfair treatment.

A.    **Mr. Stein Complains About His Unequal Treatment**

173.    Since 2015, Mr. Stein has not been promoted.

174.    Over the years, he watched as white employees with less work experience, and lower sales numbers, were promoted over him.

175.    Suspecting that he was being treated differently because of the color of his skin, when he had the opportunity and did not believe that he would suffer retaliation, Mr. Stein asked co-workers about their compensation, as compared to his.

176.    In 2017, Mr. Stein approached Mr. Brown about the disparate pay he was receiving compared to his white peers.  Specifically, he wanted to know why he received less when Mr. Stein hit his sales goals nearly every year.  In fact, Mr. Stein's sales numbers exceeded his goals for five out of seven years as a DM. Of course, Mr. Brown knew that it was true.  Therefore, Mr. Brown assured Mr. Stein he would make a "market adjustment."

177.    Mr. Brown's obligatory response was merely enough to show that he did something.  Unfortunately, the minor increase was not nearly enough to close the gap and from that point and through the present, Assurant continues to pay Mr. Stein less than his white peers for the same work.

178.    In or about 2018 to 2019, Mr. Stein again dared to complain to Mr. Brown about the ongoing unequal pay.  Mr. Brown's reaction spoke volumes.  After Mr. Stein said that he believed he was being paid less than other employees, and there was no legitimate reason, in fact, under Company policies, he was entitled to more, Mr. Brown said:

**"it's not your business how much money your coworkers make."**

179.    Subsequent to Mr. Stein's complaint, Mr. Brown scheduled a Zoom call with all employees in the Southeast Region and told them that they were not to ask one another about salaries or what they were paid.  This was an overt warning directed at Mr. Stein to stop advocating for equal treatment under the law.

180.    On November 10, 2020, distraught that nothing was being done, Mr. Stein decided to use Assurant's anonymous portal to report the racial discrimination.

181.    Specifically, Mr. Stein complained about both the failure to promote him, as compared to those white employees who were promoted, as well as his continued unequal pay as compared to white employees. Below is a portion of Mr. Stein's submitted statements to Assurant *via* the Portal:

> I would like to report that African-Americans who work for Assurant Resource Automotive are being paid substantially lower base salaries ($5000-$10,000) for the same position compared to their Caucasian counterparts even though several of us have had the same amount of related work experience/education or even significantly more experience/education on some occasions. This issue was in place already before Assurant purchased "The Warranty Group" but is still continuing today. Somebody from HR needs to look at the employment records for "Finance Specialist" and "District Manager" positions for Assurant Resource Automotive and compare starting salaries of African-Americans to Caucasian employees. In addition African-Americans are also not being promoted at the same rate as Caucasians or not promoted at all even though they have more seniority and equal or better work performance! These issues are prevalent in the South-East Division."

182.    In response, Assurant wrote to Mr. Stein via the Portal that an "investigation" was "underway."  Assurant asked him to provide specific examples, which he did..  Thereafter, Assurant went silent, did nothing and on June 9, 2021, the Portal listed that the status of his complaint was "closed."

**B.     Assurant Pays White Employees More Than Similarly Situated Black Employees**

183.    As set forth above, in 2017 and 2018, Assurant hired two young white males, Mr. Ruff and Mr. Ward.   Mr. Brown makes no effort to hide his delight in working with these employees:

   

Ryan Ruff | District Manager          Zach Ward | District Manager

184.    As DMs, Mr. Brown unilaterally provided both Mr. Ruff and Mr. Ward substantial advantages as compared to Black employees, including Plaintiffs.  For example, without any basis or explanation, Mr. Brown removed top performing client accounts from Mr. Steen throughout the Southeast and re-assigned them to Mr. Ruff and Mr. Ward.

185.    As a result, these men, through no efforts on their part to secure new business, are now reaping the commission benefits of tenured employees, at the exclusion of their Black peers.

186.    Mr. Brown, Mr. Bauer and Mr. Amendola made the decision to pay Mr. Ruff and Mr. Ward at least $100,000 more than similarly situated, and in fact more experienced DMs in the same geographical area.  The only difference is that these employees look like this:

      

Richard Stein | District Manager          Daris Steen | Area Manager          William Judson, Sr. | District Manager

187.    When questioned about this obvious unfair account distribution, Mr. Brown, Mr. Bauer and Mr. Amendola have no explanation.

188.    Confident and secure in their ability to conduct themselves in this unlawful manner, however, they do not even worry about what the minority employees think about such bias.  At all relevant times, Mr. Brown knew that his decisions would be ratified by Mr. Bauer and Mr. Amendola, and his decisions were in fact ratified by these senior executives. In fact, they recently promoted Mr. Brown.

189.    Plaintiffs have witnessed other Black field sales employees complain about their compensation to Mr. Brown, only to be told by Mr. Brown, and at times by Mr. Bauer, that they wished them well on their way out the door.  In contrast, when white employees threatened to leave for higher pay, Mr. Brown, with the approval of Mr. Bauer and Mr. Amendola, instead offered them bonuses and better accounts.

190.    For example, on at least two occasions in the past year, Mr. Brown and Mr. Bauer offered to pay Mr. Ward more money when he threatened to quit, and did in fact pay him more.

191.    Additionally, outside of work hours, Mr. Brown enjoys fishing trips with Mr. Ruff, as does Mr. Bond and Mr. Feussner.

192.    Mr. Ruff and Mr. Ward are now the highest paid DMs in the Southeast and Atlanta regions, even though they have the least experience, as compared to Plaintiffs.

193.    Appallingly, the only promotions that Assurant continues to make are for those employees, such as Mr. Brown, the very individuals that perpetrated the ongoing racial bias.  Recently, on April 21, 2022, Strickland announced to Plaintiffs and the team as follows:

From: Jeffrey Strickland <Jeffrey.Strickland@assurant.com>
Sent: Thursday, April 21, 2022 8:30 AM
Subject: Organizational Announcement – Assurant Dealer Services & Strategic Accounts

**Team**:
In an effort to continue our strong direct to dealer business across U.S. Automotive, we are pleased to announce the below organizational changes, effective immediately:…

**Brandon Brown** has been appointed Vice President, National Accounts, reporting to directly to me. Brandon will oversee the relationship with the majority of our public auto group clients. This includes the top three new vehicle volume publics (AutoNation, Lithia, Penske), in addition to the pre-owned digital public, Shift. Brandon's long term success with several of the largest private capital groups within Assurant Dealer Services, along with his deep understanding of the legacy RDG product development and client services processes, will be invaluable in his new assignment.

## RULE 23 CLASS ACTION ALLEGATIONS

### I.    CLASS DEFINITION

194.    This is a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23, brought by Plaintiffs on behalf of a Proposed Class of similarly situated employees.  The Proposed Class (subject to future revision as may be necessary), is defined as follows:

> **All current and former Black Finance Specialists, District Managers, Senior District Managers and Area Managers during the applicable statute of limitations period.**

195.    The unlawful conduct suffered by Plaintiffs and the members of the Proposed Class includes, but is not limited to, commonly experienced acts of discriminatory disparate treatment and disparate impact:

- Members of the Proposed Class have been discriminatorily denied positions and promotions as District Managers, Senior District Managers, Area Managers and other executive and managerial positions (together, the "Management Ranks") Regional Area Managers, Regional Development Managers, Vice Presidents, Senior Vice Presidents, Divisional Vice Presidents, Executive Vice

Presidents, Regional Vice Presidents, including any and all positions in Assurant's senior management ranks (together, the "Senior Management Ranks");

- Members of the Proposed Class have been totally excluded from the Senior Management Ranks;

- Members of the Proposed Class have been subjected to discriminatory retention practices and/or termination decisions;

- Members of the Proposed Class have been subjected to pervasive racial harassment and bias in the ordinary course of their work environment;

- Members of the Proposed Class have been subjected to disparate terms and conditions of employment, including but not limited to, lack of opportunity, harm to professional reputation and invidious race-based harassment; and

- Members of the Proposed Class have been subjected to unequal compensation relative to their white peers.

196. Upon information and belief, the Proposed Class contains more than 40 members during the applicable limitations period.

197. Plaintiffs and the Proposed Class have standing to seek such relief because of the adverse effects that Defendants' unlawful patterns, practices and/or policies have had on them individually and generally.

198. The patterns, practices and/or policies described in this Complaint demonstrate that discrimination is not unusual at Assurant; rather, it is part and parcel to Assurant's standard operating patterns, practices and/or policies, including because of the total exclusion from senior management ranks of any Black individual during the past fifty years.

## II.    NUMEROSITY AND IMPRACTICALITY OF JOINDER

199.    The members of the Proposed Class are sufficiently numerous to make joinder of their claims impracticable.

200.    The exact number of Proposed Class members is unknown because such information is in the exclusive control of Defendants and requires discovery.

201.    Upon information and belief, there are more than 40 current, former and prospective members of the Proposed Class who have been subjected to the discriminatory conduct described herein.

202.    Although precise determination of the number of Proposed Class members is immeasurable at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

## III.    COMMON QUESTIONS OF LAW AND FACT

203.    The claims alleged on behalf of Plaintiffs and the Proposed Class raise questions of law and fact common to all Plaintiffs and Proposed Class members.  Among these questions are:

> a.    Whether members of the Proposed Class have been denied positions with the Management Ranks and Senior Management Ranks, and whether race and/or color was a factor in those decisions;

> b.    Whether members of the Proposed Class have been subjected to discriminatory retention practices and/or termination decisions in whole or part due to race and/or color;

> c.    Whether members of the Proposed Class have been subjected to disparate terms and conditions of employment, including but not limited to, lack of opportunity, unequal opportunities for favorable geographical transfers and account assignment, harm to professional reputation, and invidious harassment due in whole or part to race and/or color;

> d.    Whether members of the Proposed Class have been subjected to unequal compensation relative to their white

peers, and whether this is due in whole or part to race and/or color;

e.    Whether members of the Proposed Class have been victimized by policies and practices of Assurant that have created a disparate impact with respect to hiring members of the Proposed Class;

f.    Whether members of the Proposed Class have been victimized by policies and practices of Assurant that have created a disparate impact with respect to the retention of members of the Proposed Class;

g.    Whether members of the Proposed Class have been victimized by policies and practices of Assurant that have created a disparate impact with respect to the termination of members of the Proposed Class;

h.    Whether members of the Proposed Class have faced retaliation for complaining about discrimination;

i.    Whether Assurant engages in discriminatory practices towards the members of the Proposed Class; and

j.    Whether Assurant engages in conduct that has a discriminatory impact on the members of the Proposed Class.

204.    Thus, the common question requirement of FRCP 23(a) is satisfied.

## IV.    **TYPICALITY OF CLAIMS AND RELIEF SOUGHT**

205.    Plaintiffs are members of the Proposed Class they seek to represent.

206.    The claims of Plaintiffs are typical of the claims of the Proposed Class in that they all arise from the same unlawful patterns, practices and/or policies of Defendants, and are based on the legal theories, including disparate treatment and impact theories, that these patterns, practices and/or policies violate legal rights.

207.    Plaintiffs and the members of the Proposed Class all allege that they each are the victims of unlawful adverse employment decisions and/or treatment based on race and/or color.

208.    The relief that Plaintiffs seek as a result Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Class.

209.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.    ADEQUACY OF REPRESENTATION

210.    The interests of Plaintiffs are co-extensive with those of the Proposed Class they seek to represent in the instant case.

211.    Plaintiffs are willing and able to represent the Proposed Class fairly and vigorously as they pursue their similar individual claims.

212.    Plaintiffs have retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

213.    The combined interests, experience and resources of Plaintiffs and their counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)(1)

214.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

215.    Specifically, all evidence of Defendants' patterns, practices and/or policies and the issue of whether they are in violation of the law would be exchanged and litigated repeatedly.

216.    Accordingly, certification of the Proposed Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Proposed Class and Defendants.

217.    By filing this Complaint, Plaintiffs are preserving the rights of Proposed Class members with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

## VII.    REQUIREMENTS OF RULE 23(b)(2)

218.    Defendants have acted on grounds, described herein, generally applicable to Plaintiffs and the members of the Proposed Class, by adopting and following systemic patterns, practices and/or policies that are discriminatory toward the Proposed Class.

219.    These discriminatory acts are fostered by Defendants' standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs and the Proposed Class as a whole, including the declaratory and injunctive relief outlined in Section A of the Prayer for Relief.

220.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination based on race and/or color committed against the Proposed Class.

221.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs and the Class Members' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination.

222.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

## VIII.    REQUIREMENTS OF RULE 23(b)(3)

223.    The common issues of fact and law affecting Plaintiffs' claims and those of the Proposed Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

224.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the Proposed Class.

225.    The cost of proving Defendants' pattern and practice of discrimination makes it impracticable for the members of the Proposed Class to pursue their claims individually.

226.    The class action will not be difficult to manage for reasons, including, but not limited to, the discrete organizational nature of the Proposed Class, as well as the common questions of law and fact described above.

### FIRST CAUSE OF ACTION
**(Disparate Treatment Discrimination under Section 1981)**
***On Behalf of Plaintiffs and the Proposed Class***
*As to all Defendants*

227.    Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

228.    As described above, Defendants have discriminated against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of Section 1981 by (i) discriminatorily denying positions with the Management Ranks and Senior Management Ranks, (ii) subjecting Proposed Class members to discriminatory retention practices and/or termination decisions, (iii) subjecting Proposed Class members to disparate terms and conditions of employment, including, but not limited to, lack of opportunity, unequal opportunities for favorable geographical transfers and account assignment, harm to professional reputation, and invidious harassment due in whole or part to race and/or color and (iv) subjecting Proposed Class members to unequal compensation relative to their white peers.

229.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually participated in and aided and abetted the discriminatory conduct of the other Defendants.

230.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

231.     Defendants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of Section 1981 for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Retaliation under Section 1981)**
***On Behalf of Plaintiffs and the Proposed Class***
*As to all Defendants*

232.     As described above, Assurant has retaliated against Plaintiffs and the Proposed Class in violation of Section 1981 by terminating them, demoting them, and subjecting them to abuse and harassment, after they made protected complaints about discrimination.

233.     As a direct and proximate result of the unlawful retaliatory conduct taken by the Assurant in violation of Section 1981, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

234.     The unlawful retaliatory conduct taken by Assurant constitutes reckless, malicious, willful and wanton violations of Section 1981 for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Discrimination and Retaliation under Atlanta Code of Ordinances Sec. 94-112)**
***On Behalf of Plaintiff Judson and the Proposed Class***
*As to all Defendants*

235.    As described above, Defendants have discriminated and retaliated against Plaintiff Judson and the Proposed Class on the basis of race and/or color and in retaliation for their protected complaints of discrimination in violation of Atlanta Code of Ordinances Sec. 94-112.

236.    As a direct and proximate result of the unlawful discriminatory and retaliatory conduct taken by the Assurant in violation of Sec. 94-112, Plaintiff Judson and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

237.    The unlawful discriminatory and retaliatory conduct taken by Assurant constitutes reckless, malicious, willful and wanton violations of Atlanta Code of Ordinances Sec. 94-112 for which Plaintiff Judson and the Proposed Class are entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
**(Discrimination and Retaliation under Miami-Dade County Code Sec. 11A-26)**
***On Behalf of Plaintiff Steen and the Proposed Class***
*As to all Defendants*

238.    As described above, Defendants have discriminated and retaliated against Plaintiff Steen on the basis of race and/or color and in retaliation for his protected complaints of discrimination in violation of Miami-Dade County Code of Ordinances Sec. 11A-26.

239.    As a direct and proximate result of the unlawful discriminatory and retaliatory conduct taken by the Assurant in violation of Sec. 11A-26, Plaintiff Steen has suffered, and continues to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

240.    The unlawful discriminatory and retaliatory conduct taken by Assurant constitutes reckless, malicious, willful and wanton violations of Sec. 11A-26 for which Plaintiff Steen is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Discrimination in Violation of the ADEA)
#### *On Behalf of Plaintiff Judson*
*As to Defendant Assurant*

241.    Plaintiff Judson hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

242.    By the actions described above, Defendant Assurant has discriminated against Plaintiff Judson on the basis of his age in violation of the ADEA, including, but not limited to, by terminating him.

243.    As a direct and proximate result of Defendant Assurant's unlawful discriminatory conduct in violation of the ADEA, Plaintiff Judson has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of damages.

244.    As a direct and proximate result, Plaintiff Judson has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of compensatory damages and other relief.

245.    Plaintiff Judson is further entitled to an award of liquidated damages as Defendant Assurant's unlawful conduct was and remains willful.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of the ADEA)
#### *On Behalf of Plaintiff Judson*
*As to Defendant Assurant*

246.    Plaintiff Judson hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

247.     By the actions described above, Defendant Assurant retaliated against Plaintiff Judson based on his protected activities in violation of the ADEA, including but not limited to, by terminating him.

248.     As a direct and proximate result of Defendant Assurant's unlawful retaliatory conduct in violation of the ADEA, Plaintiff Judson has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of damages.

249.     As a direct and proximate result, Plaintiff Judson has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of compensatory damages and other relief.

250.     Plaintiff Judson is further entitled to an award of liquidated damages as Defendant Assurant's unlawful conduct was and remains willful.

### SEVENTH CAUSE OF ACTION
**(Race Discrimination and Retaliation in Violation of Title VII)**
***On Behalf of Plaintiff Judson and the Proposed Class***
*As to Defendant Assurant*

251.     Plaintiff Judson repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

252.     By the actions described above, among others, Defendant Assurant discriminated against Plaintiff Judson on the basis of his race in violation of Title VII by subjecting him to disparate treatment based upon his race, including, but not limited to, subjecting him to harassment, giving him less favorable work assignments based on his race, repeatedly denying him promotions based on his race, and ultimately terminating him both because of his race and because of he had made protected complaints of race discrimination.

253.     As a direct and proximate result of Defendant Assurant's unlawful and discriminatory conduct, Plaintiff Judson has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief.

254.     As a direct and proximate result, Plaintiff Judson has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief.

255.     Defendant Assurant's unlawful discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff Judson is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
**(Discrimination and Retaliation in Violation of ADA)**
***On Behalf of Plaintiff Judson***
*As to Defendant Assurant*

256.     Plaintiff Judson hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

257.     Defendant Assurant discriminated against Plaintiff Judson on the basis of his known disability and/or perceived disability in violation of ADA by, *inter alia*, subjecting his to a hostile work environment and unlawfully terminating his employment because of his disability and because he requested an accommodation for a known disability.

258.     As a direct and proximate result of Defendant Assurant's unlawful discriminatory conduct in violation of ADA, Plaintiff Judson has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

259.    As a direct and proximate result of Defendant Assurant's unlawful discriminatory conduct in violation of ADA, Plaintiff Judson has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

260.    Defendant Assurant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of ADA, for which Plaintiff Judson is entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court issue a declaratory judgment that the actions, conduct and practices of the Defendants complained of herein violates the federal, state and local laws asserted herein, and issue the following additional relief:

a.    An award of damages to Plaintiffs and the Proposed Class and against the Defendants, in an amount to be determined at trial, to compensate them for all monetary and/or economic damages;

b.    An award of damages to Plaintiffs and the Proposed Class and against the Defendants, in an amount to be determined at trial, to compensate them for all non-monetary and/or compensatory damages, including, but not limited to, loss of reputation, loss of opportunity and mental anguish;

c.    An award of punitive and/or liquidated damages to Plaintiffs and the Proposed Class and against the Defendants in an amount to be determined at trial;

d.    Pre- and post-judgment interest on all amounts due;

e.    An award of Plaintiffs and the Proposed Class's reasonable attorneys' fees and costs; and

f.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs and the Proposed Class hereby demand a trial by jury.

Dated: June 2, 2022
     New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
    Jeanne M. Christensen
    John S. Crain

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
jchristensen@wigdorlaw.com
jcrain@wigdorlaw.com

*Counsel for Plaintiffs and the*
*Proposed Class*